IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

M.S.P.C.,

　　　　Petitioner,

v.                                                                CIV 14-769 JCH/CG

U.S. Customs and Border Protection; U.S.
Department of Homeland Security; Jeh
Johnson, Secretary of DHS; Eric H. Holder,
Jr., Attorney General of the United States; R.
Gil Kerlikowske, Commissioner of CBP;
Thomas S. Winkowski, Principal Deputy
Assistant Secretary, Immigration and
Customs Enforcement; Leon Rodriguez,
Director of U.S. Citizenship and Immigration
Services; Hector Mancha, El Paso Director of
Field Operations, CBP; Martin E. Zelenka,
ICE Officer-in-Charge, Artesia; and Adrian
P. Macias, El Paso Field Office Director,
ICE,

　　　　Respondents.

## MEMORANDUM OPINION AND ORDER

　　　　This matter comes before the Court on Petitioner M.S.P.C.'s Emergency Motion for Stay

of Removal (ECF No. 2).  The Court held a telephonic hearing on the motion on September 4,

2014, and ordered supplemental briefing.  The Court, having considered the motion, briefs,

arguments of the parties, applicable law, and otherwise being fully advised, concludes that

Petitioner's emergency motion for stay of removal must be denied for lack of jurisdiction.

## I.　　FACTUAL BACKGROUND

　　　　Petitioner M.S.P.C. is a native and citizen of El Salvador who fled her home country with

her 10-month old son because they became the targets of gangs who controlled the area where

they lived.  Petition ¶¶ 4, 26, 27, ECF No. 1.  One gang tried to force Petitioner to become an informant for them; the other accused her of acting as an informant for its rival; and members of both gangs threatened to kill her and her baby.  *Id.* ¶ 27.  Gang members came to her house and harassed her, caressing her face and running the barrel of their guns along her neck threateningly.  *Id.*  In Petitioner's experience, the police in El Salvador can do nothing to stop the gangs, the police will often tell gangs if a person makes a report against them, and the gangs then retaliate against the citizen who reported them.  *Id.* ¶ 28.  After one gang told her she had "48 hours to leave or they would kill [her]," she fled the country with her baby.  *Id.*¶ 27.  Petitioner also fears returning to El Salvador because her son's father subjected her to violent abuse, repeatedly beating her.  *Id.* ¶ 29.  He also abused her after she decided to flee El Salvador.  Decl. of M.S.P.C. ¶ 22, ECF No. 14.

On June 25, 2014, thirty minutes after Petitioner and her son entered the United States via raft at or near Hidalgo, Texas, United States Border Patrol officers apprehended them.  *See* Resp't's App'x, ECF No. 34 at 2 of 14; Petition at 1, ¶¶ 4, 15, ECF No. 1.  They were placed into expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii).  Petition at 1, ¶ 15, ECF No. 1.

While detained in a Border Patrol facility, an immigration officer interviewed her and asked why she came to the United States.  *Id.* ¶ 33.  When she told him that she came because she was threatened by gang members, she was not allowed to say more; instead, the immigration officer made her sign papers in English that she did not understand.  *Id.* ¶ 33.  Petitioner and her son were later transferred to the Artesia Family Residential Center in Artesia, New Mexico.  *Id.* at 1, ¶ 34.

On or near July 9, 2014, in Artesia, Petitioner had a credible fear interview, but she asserts that procedural and substantive flaws undermined the fairness of the interview.  *See*

Petition ¶ 35, ECF No. 1; Resp't's App'x, ECF No. 34 at 6 of 14.   When first notified of the interview, she was not told what its purpose was, and when she tried to find a lawyer to help her, an immigration officer told her "it was not necessary," so she had no attorney to consult with or attend the interview with her.   *Id.* ¶ 37.   During the interview, she was holding her baby and found it hard to concentrate, because she was not offered childcare.   *Id.* ¶ 38.   Although there was a Spanish interpreter on the telephone, Petitioner did not think the interpreter could speak Spanish well and did not seem to understand her.   *Id.* ¶ 39.   Consequently, she found it difficult to explain why she left El Salvador and why she was afraid to return.   *Id.*   At the end of the interview, the asylum officer gave her a paper written in English, but she does not understand English, so she could not read what it said.   *Id.* ¶ 40.   The asylum officer issued a negative credible fear determination.   *Id.* ¶ 41.

After Petitioner's interview with the asylum officer, a relative found a lawyer to help her, but numerous restrictions on her telephone access prevented her from talking to the lawyer before her hearing with the immigration judge.   *See id.* ¶ 43; Decl. of M.S.P.C. ¶ 12, ECF No. 14.   About 10 days after her interview with the asylum officer, Petitioner was called to a video hearing with the immigration judge.   Decl. of M.S.P.C. ¶ 13, ECF No. 14.   At the hearing, the immigration judge asked her if she had a lawyer, and she responded that she had not had a chance to talk to her attorney.   *Id.* The judge said he would call her back in three days to give her an opportunity to consult with her attorney.   *Id.*   Over the next three days, she attempted to reach her attorney, but was unable to do so because she could only use the phone once a day for 15 minutes, and if she could not reach her lawyer, she could not try again until the next day.   *Id.* ¶ 14.

Three days later, the judge held the hearing without counsel present.   *See id.* ¶ 15;

Petition ¶ 44, ECF No. 1.   During the hearing, Petitioner's baby was present, which made it difficult for her to respond to questions.   Decl. of M.S.P.C. ¶ 15, ECF No. 14.   The immigration judge affirmed the asylum officer's negative credible fear determination and M.S.P.C. is now subject to an expedited removal order.   *Id.* ¶¶ 15-16; Petition ¶ 46, ECF No. 1.   Petitioner, through counsel, has filed four motions to reconsider the negative credible fear determination, and the Houston Asylum Office has denied two of the four motions to reconsider and the remaining two are pending denial.   Resp't's App'x, ECF No. 34 at 13 of 14.

On August 22, 2014, Petitioner M.S.P.C., on behalf of herself and her 10-month old son, petitioned the Court for a writ of habeas corpus and for declaratory and injunctive relief.   Petition 1, ECF No. 1.   Petitioner asserts two causes of action based on the allegedly erroneous conclusion that she could not satisfy the "credible fear" test and for numerous purported violations of her procedural rights that undermined her right to a meaningful asylum hearing:   (1) violations of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*; the United Nations Convention Against Torture, implemented in the Foreign Affairs Reform Restructuring Act of 1998, 112 Stat. 2681, 2681-822 (codified as Note to 8 U.S.C. § 1231); and the INA implementing regulations; and (2) violation of the Due Process Clause of the Fifth Amendment. Petition 12-14, ECF No. 1.   Among the procedural rights she alleges Defendants violated are the lack of adequate notice of the hearing, the failure to provide her a meaningful opportunity to consult with counsel, the failure to provide child care during the interviews, and applying a higher legal standard for her credible fear determination than is established by the INA and its regulations.   *See id.* ¶¶ 53, 60.

Petitioner also filed an Emergency Motion for Stay of Removal, seeking a stay of proceedings pending the outcome of her habeas petition.   Pet'r's Mem. 2, ECF No. 3.   Petitioner

contends she faces irreparable harm if removed, because she and her child may be killed or injured if returned to El Salvador.  *Id.* She contends further that she has a likelihood of success on the merits because the facts of her situation easily satisfy the credible fear standard, which is generally set at a low threshold to ensure that the first stage of the process does not eliminate valid asylum claims, and because she had a constitutionally-protected liberty interest in applying for asylum under the Fifth Amendment that Defendants violated through the procedural defects in the hearing.  *See id.* at 7-12.  Finally, Petitioner contends that this Court has jurisdiction under 28 U.S.C. § 2241, 8 U.S.C. § 1252(e)(2)(B), and the Suspension Clause set forth in Article I, Section 9, Clause 2 of the Constitution.

The Government filed a response opposing the emergency motion for stay of removal. Resp't's Resp., ECF. No. 17.  The Government argues that the Court lacks jurisdiction to issue an order staying execution of Petitioner's expedited removal order because 8 U.S.C. § 1252(g) expressly forecloses such relief.  *Id.* at 4.  The Government additionally asserts that, even if the Court has jurisdiction to grant the requested stay, Petitioner cannot show a likelihood of success on the merits, primarily because this Court lacks jurisdiction to review the immigration judge's negative credible fear determination.  *See id.* at 5-10.

The Court held a hearing on the motion on September 4, 2014, during which it considered further argument by the parties.  At the hearing, the Government conceded that this Court has jurisdiction to issue a stay of removal while it considers its own jurisdiction.  The Court entered a limited stay to consider the jurisdictional issues and requested additional briefing on the Suspension Clause issue.  Having considered the supplemental briefs (ECF Nos. 33 and 37) submitted by the parties, including Respondents' Amended Appendix (ECF No. 34) and Notice of Supplemental Authority (ECF No. 38) and Petitioner's response to the notice (ECF No.

39), the Court has concluded that it does not have jurisdiction to determine the statutory and constitutional claims in the Petition.

## II.    STANDARD

"Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  The party asserting jurisdiction has the burden of proving its existence.  *Id.*

"A stay is not a matter of right, even if irreparable injury might otherwise result."  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).  Requests for stays in immigration cases are governed by the traditional four-factor test for all stays, requiring a court to consider:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Id.* at 425-26.  The party requesting a stay bears the burden of showing that the court should exercise its discretion to grant the stay.  *Id.* at 434.

## III.    STATUTORY BACKGROUND

### A.    Expedited Removal Process

Section 1225(b)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, as amended by the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"), governs procedures for the inspection of aliens arriving in the United States who have not been admitted or paroled.  8 U.S.C. § 1225(b)(1).  Aliens who have not been admitted or paroled into the United States and who have not satisfactorily demonstrated to an immigration officer that the alien has been physically present in the United States continuously for the prior two years are

subject to expedited removal without further hearing or review, unless the alien indicates an intention to apply for asylum or a fear of persecution, at which point the immigration officer shall refer the alien for an interview by an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(i)-(iii).  In 2004, the Attorney General began to apply expedited removal proceedings to inadmissible aliens present within the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are apprehended within 100 miles of the border and who are unable to show that they have been physically present in the United States continuously for the 14-day period immediately prior to the date of encounter with immigration authorities.  *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01 (Aug. 11, 2004).

     If the asylum officer determines at the time of the interview that the alien has a "credible fear of persecution," the alien must be detained for further consideration of the asylum application.  8 U.S.C. § 1225(b)(1)(B)(ii).  A "credible fear of persecution" means "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title."  *Id.* § 1225(b)(1)(B)(v).  If, however, the asylum officer determines that the alien does not have a credible fear of persecution, the officer "shall order the alien removed from the United States without further hearing or review."  *Id.* § 1225(b)(1)(B)(iii)(I).  The asylum officer must prepare a written record of the determination, including a summary of the facts and an analysis of why the alien has not made the credible fear showing.  *Id.* § 1225(b)(1)(B)(iii)(II).  The alien may then request review by an immigration judge, and such review must be done as expeditiously as possible, to the maximum extent practicable within 24 hours, but no later than 7 days after the asylum officer's

determination, and the review must include an opportunity for the alien to be heard and questioned by the immigration judge.  *Id.* § 1225(b)(1)(B)(iii)(III).  The alien "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," but such consultation "shall not unreasonably delay the process."  *Id.* § 1225(b)(1)(B)(iv).

### B.    Jurisdiction

The Suspension Clause states:  "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2.  District courts generally have power to grant writs of habeas corpus under 28 U.S.C. § 2241.  Title 8 U.S.C. § 1252(a)(2)(A), however, establishes and limits the jurisdiction of courts to hear challenges to expedited removal orders:  "Notwithstanding any other provision of law . . ., including section 2241 of Title 28, . . . no court shall have jurisdiction to review . . . any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," subject to the limited exceptions set forth in subsection (e).  8 U.S.C. § 1252(a)(2)(A)(i).  Specifically, no court has jurisdiction to review "a decision by the Attorney General to invoke the provisions of [§ 1225(b)(1)]," "the application of [that] section to individual aliens," or "procedures and policies adopted by the Attorney General to implement [that section]."  *Id.*  § 1252(a)(2)(A)(ii)-(iv).  Additionally, § 1252(g) provides:  "Except as provided in this section . . ., no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." *Id.* § 1252(g).

8

Subsection (e) of § 1252 strips courts of jurisdiction to "enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection."  8 U.S.C. § 1252(e)(1)(A).  As for habeas corpus proceedings, subsection (e) states:

> Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of--
>
> > (A) whether the petitioner is an alien,
> >
> > (B) whether the petitioner was ordered removed under such section, and
> >
> > (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee ..., or has been granted asylum . . . .

*Id.* at § 1252(e)(2)(A)-(C).  Section 1252(e)(5) clarifies the meaning of "whether the petitioner was ordered removed" by stating that:

> > In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

*Id.* § 1252(e)(5).

Subsection (e)(3) of § 1252 further provides that judicial review of challenges on the validity of the system, specifically whether a section or implementing regulation is constitutional or whether regulations, policies, or procedures issued by the Attorney General violate the law, is available in the United States District Court for the District of Columbia.  *Id.* § 1252(e)(3)(A). The deadline for bringing such actions under subsection (e)(3)(A) is "no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented."  *Id.* § 1252(e)(3)(B).

**IV.    LEGAL ANALYSIS**

### A. Jurisdiction-Stripping Provisions of Section 1252 Expressly Preclude Jurisdiction over Merits of Petition

The Government first argues that this Court lacks jurisdiction to enter a stay of execution of Petitioner's removal order based on 8 U.S.C. § 1252(g), which strips the courts of jurisdiction over claims arising from decisions by the Attorney General to execute removal orders against an alien. The Government contends that, because Petitioner is not properly challenging her removal order under Section 1252(e), she may not invoke any provision of Section 1252 as authorizing a stay of removal. Given the language "[e]xcept as provided in this section," the analysis of jurisdiction under Section 1252(g) is essentially the same as under Section 1252(e), so the Court will turn to that section.

Petitioner acknowledges in her writ of habeas corpus and complaint that she is subject to an expedited removal order pursuant to 8 U.S.C. § 1225(b)(1). "The scope of judicial review of orders of removal under § 1225(b)(1) is extremely narrow." *Vaupel v. Ortiz*, 244 F. App'x 892, 894 (10th Cir. 2007). *See also Lorenzo v. Mukasey*, 508 F.3d 1278, 1281 (10th Cir. 2007) ("The avenues for review provided by § 1252(e) are strictly limited . . . ."). Despite the very narrow restrictions on jurisdiction set forth in Section 1252(e), Petitioner argues that Section 1252(e)(2)(B)'s jurisdiction to review "whether the petitioner was ordered removed" includes the issue of whether Petitioner should have been given an expedited removal order in the first place.

The Court disagrees. Petitioner's expansive reading of Section 1252(e)(2)(B) is foreclosed by Section 1252(e)(5), in which Congress divested the district courts of jurisdiction to review "whether the alien is actually inadmissible or entitled to any relief from removal." Instead, Congress made clear that the only review contemplated in Section 1252(e)(2)(B) is "whether such an order in fact was issued and whether it relates to the petitioner." *Cf. Khan v. Holder*, 608 F.3d 325, 327 (7th Cir. 2010) (holding that court lacked jurisdiction to review merits

of question of whether immigration officer correctly initiated expedited removal proceedings); *Brumme v. I.N.S.*, 275 F.3d 443, 447-48 (5th Cir. 2001) (holding that section 1252(e)(2) clearly does not permit court to review whether expedited removal statute applies in first place). Petitioner argues that, to read the first sentence of Section 1252(e)(5) to allow review only of whether an immigration officer issued a piece of paper stamped "expedited removal order" would render the second sentence superfluous.  Rather than being superfluous, however, the second sentence seems to clarify that Congress really did mean what it said in the first sentence – review should only be for whether an immigration officer issued that piece of paper and whether the Petitioner is the same person referred to in that order.  It appears that Congress contemplated that courts may not like the restricted review set forth in the first sentence, so in the second sentence, it foreclosed courts from using a more expansive interpretation of the first sentence, as urged by Petitioner.[1]

Additionally, Petitioner contends that the relief she seeks is not "from removal," but limited to being "taken out of the expedited removal system and given a regular immigration

---

[1] Although the plain language of the statute precludes the need to resort to a legislative history analysis, the Court notes that the legislative history supports the more narrow reading of the judicial review intended by Congress. Congress adopted the IIRIRA reforms to address the following problems with the former system:

> Thousands of smuggled aliens arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival. Due to lack of detention space and overcrowded immigration court dockets, many have been released into the general population. Not surprisingly, a majority of such aliens do not return for their hearings. . . .

> Finally, many aliens successfully smuggled into the United States have filed asylum claims as a means not only to extend their stay, but, under regulations in effect until January 1995, to obtain work authorization. Due to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States.

*See* H.R. Rep. 104-469, pt. 1, at 117-18 (1996).  Limiting judicial review as directed by the plain language of the statute fulfills Congress's twin aims of "expedit[ing] the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States, while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims."  H.R. Conf. Rep. No. 104-828, at 209 (1996).

judge hearing."   The requested relief, however, even if ultimately temporary, is an order from this Court halting removal under the pending removal order.  She is thus seeking "any relief from removal."  For all the foregoing reasons, this Court concludes the plain language of Section 1252 strips this Court of jurisdiction to consider Petitioner's claims.  *Cf. Smith v. U.S. Customs and Border Protection*, 741 F.3d 1016, 1021-22 & n.4 (9th Cir. 2014) (limiting review to whether petitioner had been "ordered removed" under section 1225 and refusing to evaluate merits of Border Patrol's decision to classify petitioner as an intending immigrant); *Shunaula v. Holder*, 732 F.3d 143, 146-47 (2d Cir. 2013) (holding that court did not have jurisdiction under 8 U.S.C. § 1252(a)(2)(A) to hear alien's collateral attack on his order of expedited removal where he alleged illegality in Attorney General's particular decision to remove him and in specific way his removal was carried out); *Garcia de Rincon v. DHS*, 539 F.3d 1133, 1138-39 (9th Cir. 2008) (holding that § 1252(a)(2)(A) presents jurisdictional bar to collateral attack on expedited removal order); *Lorenzo*, 508 F.3d at 1281 ("Petitioner's 1998 removal order was issued pursuant to § 1225(b)(1).  As a result, we lack jurisdiction to review any constitutional or statutory claims related to the underlying removal order in this case."); *Vaupel*, 244 F. App'x at 895 (holding that court of appeals lacked jurisdiction to review alien's habeas claims seeking review of expedited removal order, including whether expedited removal statute was lawfully applied to alien and whether expedited removal procedures violated his right to due process, because language of Section 1252(e)(5) clearly precludes review in habeas proceedings of whether alien is actually inadmissible or entitled to any relief from removal).[2]

Petitioner argues that this statutory interpretation allows the government to "insulate the

---

[2] This Court disagrees with Petitioner that the cases arising in the context of reinstatement from removal are meaningfully distinguishable regarding how to interpret Section 1252(e).  *See Khan*, 608 F.3d at 329 ("While the Khans attempt to distinguish these cases because they involved collateral attacks to expedited removal in the context of reinstatement of removal, the language of the cases is not so limited . . . .").

entire credible fear process, thereby subjecting bona fide asylum applicants to expedited removal even though Congress intended them to have full immigration judge hearings." Pet'r's Mem. 13, ECF No. 3.  Petitioners are partially correct.  Certainly, this construction means that the statute insulates a negative credible fear determination from review by the courts.  However, contrary to Petitioner's contention, based on the clear and unambiguous language in Section 1225(b)(1)(B) and Sections 1252(e) and 1252(e)(5), Congress clearly intended to preclude further administrative and judicial review of negative credible fear determinations beyond the immigration judge's review set forth in § 1225(b)(1)(B)(iii)(III).  Congress has decided that one level of review, completely within the Executive Branch, of the asylum officer's negative credible fear determination, is all that is necessary.

This Court recognizes the harsh consequences that this statutory scheme places on aliens who may receive an erroneous negative fear determination by both the asylum officer and immigration judge.  While this Court sympathizes with Petitioner's plight, nothing in the statute or case law indicates that Congress did not intend this result when it severely restricted judicial review of section 1225(b)(1) orders in section 1252(e).  The Seventh Circuit's explanation in *Khan v. Holder* bears repetition here:

> The troubling reality of the expedited removal procedure is that a CBP officer can create the § 1182(a)(7) charge by deciding to convert the person's status from a non-immigrant with valid papers to an intending immigrant without the proper papers, and then that same officer, free from the risk of judicial oversight, can confirm his or her suspicions of the person's intentions and find the person guilty of that charge. The entire process-from the initial decision to convert the person's status to removal-can happen without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards. To say that this procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior (suppose a particular CBP officer decides that enough visitors from Africa have already entered the United States) is not, however, to say that courts are free to disregard jurisdictional limitations. They are not, and we thus must align ourselves with the courts that have considered the issue and hold that we lack jurisdiction to inquire whether the expedited removal procedure

to which the Khans were subjected was properly invoked. *Brumme v. INS*, 275 F.3d 443 (5th Cir. 2001); *Li v. Eddy*, 259 F.3d 1132, 1134 (9th Cir.2001), *opinion vacated as moot*, 324 F.3d 1109 (9th Cir.2003) ("On its face, subsection (e)(2) does not appear to permit the court to inquire into whether section 1225(b)(1) was properly invoked, but only whether it was invoked at all.").

608 F.3d at 329-30.

### B.     Jurisdiction-Stripping Provisions of Section 1252 Do Not Violate Petitioner's Suspension Clause Rights

Petitioner nevertheless argues that, even if the statutory grants of jurisdiction do not provide her relief, the Suspension Clause protects her right of access to the courts.[3]  Petitioner claims that Section 1252(e)(2)'s narrow scope of review does not allow her to fully adjudicate her statutory and constitutional rights, and thus unconstitutionally suspends the writ.  Assuming that Petitioner is not asking this Court to impermissibly review the validity of the jurisdiction-stripping provisions as a whole, the Court finds that any rights the petitioner may have under the Suspension Clause are not violated in this case.

### 1.     Law on Suspension Clause

Habeas corpus was the traditional remedy by which to challenge a deportation order in the courts.  *See Heikkila v. Barber*, 345 U.S. 229, 230 (1953).  The writ of habeas corpus has historically been available for non-enemy aliens, as well as citizens, to challenge their Executive detention based on certain statutory and constitutional errors.  *See I.N.S. v. St. Cyr*, 553 U.S. 289, 301-02 (2001).  The scope of the protections and relief available under the writ for certain aliens, however, is of considerable ambiguity and debate.  *See id.* at 300-08.  Consequently, courts have

---

[3] The Court recognizes the principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, the Court should determine whether a construction of the statute is fairly possible by which the question may be avoided.  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  As explained *supra*, the statute clearly strips the Court of jurisdiction to consider the claims raised in the Petition, and thus the constitutional question cannot be avoided.  *Cf. Swain v. Pressley*, 430 U.S. 372, 378 (1977) ("Notwithstanding the desirability of adopting a construction of the statute which would avoid the constitutional issue raised by respondent, we are convinced that the language of s 23-110(g) is sufficiently plain to require us simply to read it as it is written.").

often avoided the "difficult and significant" questions concerning the scope of the historic writ and the resulting implications under the Suspension Clause. *See*, *e.g.*, *St. Cyr*, 533 U.S. at 304-05. *See also Boumediene v. Bush*, 553 U.S. 723, 773 (2008) ("Our case law does not contain extensive discussion of standards defining suspension of the writ or of circumstances under which suspension has occurred.").

What little is clear in a Suspension Clause analysis is that, at a minimum, the Suspension Clause protects the writ of habeas corpus as it existed in 1789. *See St. Cyr*, 533 U.S. at 301.[4] "[T]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus." *Swain v. Pressley*, 430 U.S. 372, 381 (1977). When the Suspension Clause applies to the petitioner detainee, "the question becomes whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate procedures for habeas corpus." *See Boumediene*, 553 U.S. at 771.

The Tenth Circuit, in dicta, has suggested that an important factor in the Suspension Clause analysis is whether the jurisdiction-stripping statute "preserves judicial review for 'substantial' constitutional errors." *Fernandez v. I.N.S.*, 113 F.3d 1151, 1155 & n.3 (10th Cir. 1997) (declining to consider Suspension Clause issue because statutory provisions at issue, section 440(a) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), left open possibility that habeas jurisdiction exists under section 2241 and government conceded that section 440(a) preserved judicial review for "substantial" constitutional errors). Again in dicta, the Tenth Circuit particularly noted "the importance of independent judicial review" in asylum

---

[4] The Supreme Court "has been careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope of the writ." *Boumediene*, 533 U.S. at 746. The Court has yet to resolve the issue definitively, instead beginning its analysis with precedents as of 1789. *See id.*

cases "in an area where administrative decisions can mean the difference between freedom and oppression and, quite possibly, life and death." *Id.* (quoting *Rodriguez-Roman v. INS*, 98 F.3d 416, 432 (9th Cir. 1996) (Kozinski, J., concurring)). The Tenth Circuit hoped that careful administrative review, "coupled with whatever habeas review or review for substantial constitutional errors may be available, will meet the moral and historical requirements for which our country is known." *Id.*

The error Petitioner asserts in her Petition is the denial of her right to fair process under the Due Process Clause and the INA and FARRA. Consequently, of importance here is whether habeas review in 1789 entitled an alien, like petitioner, to judicial review of these procedural claims.

## 2.      Procedural Due Process Rights of Aliens

The Fifth Amendment protects aliens and citizens, even aliens "whose presence in this country is unlawful, involuntary, or transitory." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). *See also Zadvydas v. Davis*, 533 U.S. 678, 684-85, 689 (2001) ("But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (holding that due process and equal protection clauses of Fourteenth Amendment are not confined to protection of citizens; rather, they apply "to all persons within the territorial jurisdiction"). The fact that aliens within the territorial jurisdiction of the United States are protected by the Due Process Clause, however, does not lead to the conclusion that all aliens are entitled to the same rights as citizens or to the conclusion that all aliens must be treated alike. *See Mathews*, 426 U.S. at 78. Indeed, the Supreme Court has held that, although the Due Process Clause protects an alien subject to a final

order of deportation, "the nature of that protection may vary depending upon status and circumstance." *Zadvydas*, 533 U.S. 694. *See also Wong Wing v. United States*, 163 U.S. 228, 232-38 (1896) (holding that, despite fact that Congress could withhold judicial review of decision to not admit resident alien seeking re-admission upon landing and vest decision exclusively with executive officers, alien did have rights to due process to challenge provision of statute confining alien to year of hard labor).

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693. Supreme Court precedent makes a distinction between aliens coming to our shores and borders seeking admission and aliens who are within the United States after an entry, irrespective of its legality, because the latter category of aliens have additional rights and privileges not extended to aliens "on the threshold of initial entry." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 175 (1993) (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 186 (1958)). *See also Bayo v. Napolitano*, 593 F.3d 495, 502 (7th Cir. 2010) (stating that aliens "who stand at the threshold of admission are subject to special rules") (citing *Shaughnessy v. United States*, 345 U.S. 206, 212 (1953)). The immigration laws have likewise historically maintained this distinction, creating two types of proceedings to remove aliens from the United States: deportation and exclusion. *See Sale*, 509 U.S. at 175 (quoting *Leng May Ma*, 357 U.S. at 186); *Landon v. Plasencia*, 459 U.S. 21, 25 (1982). Deportation hearings, with greater procedural protections, are used for aliens already physically present in the country, while exclusion hearings are used against aliens outside the United States seeking admission into the country and are usually held at a port of entry. *Plasencia*, 459 U.S. at 25-27.

In early iterations of the immigration statutes, as today, Congress entrusted the final

determination of an alien immigrant's right to land to executive officers, and the Supreme Court upheld these congressional restrictions on judicial review.  *See Heikkila*, 345 U.S. at 233-34 (discussing *Nisbimura Ekiu v. United States*, 142 U.S. 651 (1892), and later cases upholding congressional decision to place final determination of right of admission in executive officers, without judicial intervention).  The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Plasencia*, 459 U.S. at 32.  As the Supreme Court explained:

> Admission of aliens to the United States is a privilege granted by the sovereign United States Government.  Such privilege is granted to an alien only upon such terms as the United States shall prescribe. . .
>
> . . . Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien. . . .
>
> . . . Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.

*U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-44 (1950).

Aliens physically allowed within the borders of the United States pending a determination of admissibility are considered to be detained at the border, and hence, as never having effected an entry into this country and not having any constitutional rights with respect to their applications for admission.  *See American Immigration Lawyers Ass'n v. Reno*, 18 F.Supp.2d 38, 58-59 (D.D.C. 1998) (and cases cited therein).  *See also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) ("Aliens seeking entry from contiguous lands obviously can be turned back at the border without more. . . . [T]emporary harborage [from ship to shore], an act of legislative grace, bestows no additional rights. . . . And this Court has long

considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border."). This principle is known as the "entry fiction." *Gisbert v. United States Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir. 1993).

In *Garcia de Rincon v. Department of Homeland Security*, a case extensively relied upon by the Government, the Ninth Circuit concluded that the lack of procedural due process rights for non-resident aliens seeking entry at the border was dispositive of the argument that the limitations on jurisdiction in 8 U.S.C. § 1252 violated the petitioner's Suspension Clause rights. *Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1141 (9th Cir. 2008) (relying on reasoning of *Li v. Eddy*, 259 F.3d 1132 (9th Cir. 2001), despite its subsequently being vacated as moot in 324 F.3d 1109 (9th Cir. 2003)). Garcia de Rincon, a citizen of Mexico, entered the United States in 1995, married a lawful permanent resident in 1997, and lived in the United States until sometime in 1999 when she travelled to Mexico to visit her ailing mother. *See id.* at 1135. When she attempted re-entry into the United States in April 1999, she was detained at the border and an expedited removal order was issued the same day, deeming her removable as an alien who had falsely attempted to gain admission as a United States citizen. *See id.* Within days of her expedited removal, she returned to the United States unlawfully where she lived with her family. *Id.* In 2002, Garcia de Rincon filed a Form I-485 Application for Adjustment of Status and an I-212 Application for Permission to Reapply for Admission. *Id.* When Immigrations and Customs Enforcement searched her records and discovered the prior false statement, it arrested her under a warrant, reinstated the prior expedited removal order, and removed her. *See id.* at 1135-36.

The Ninth Circuit concluded that it lacked jurisdiction over Garcia de Rincon's habeas petition under section 1252(e). *Id.* at 1140. The Ninth Circuit explained that restrictions on

habeas review of expedited removal orders do not raise the Suspension Clause problems alluded to in *St. Cyr*, provided that the petitioner has not been lawfully admitted. *See id.* at 1141. The *Garcia de Rincon* court then quoted *Li v. Eddy*, which held that Li, as a non-resident alien seeking entry at the border, had no constitutional right to due process. *Id.* (quoting *Li*, 259 F.3d at 1136). Acknowledging that *Li* was not *per se* a Suspension Clause case, the Ninth Circuit nonetheless concluded that *Li* "discredit[s] the generalized due process argument raised by de Rincon, which is the right she seeks to vindicate via habeas." *Id.*

The Government argues that *Garcia de Rincon* and *Li* stand for the proposition that non-admitted aliens lack Suspension Clause rights in relation to their admission. Petitioner argues that *Garcia de Rincon* was wrongly and cursorily decided because the Due Process Clause and Suspension Clause are not coterminous. This Court, however, finds persuasive the importance the Ninth Circuit placed on the petitioner's lack of due process rights with respect to her application for admission as an arriving alien at the border. As discussed *supra*, the scope of the writ of habeas corpus used by aliens seeking admission to this country never included remedies for procedural violations under the Due Process Clause, because, as the Supreme Court settled long ago and stated repeatedly thereafter, Congress has the power to exclude aliens and to vest the enforcement of the terms and conditions of entry exclusively through executive officers, without judicial intervention. *See*, *e.g.*, *Wong Wing*, 163 U.S. at 233-37. Consequently, the fact that the statutory scheme does not allow such aliens to make a constitutional due process claim in relation to their admission in their writ of habeas corpus does not suspend the writ, because there never was any such remedy to be had under the writ. As for arriving aliens, the habeas review provisions in Section 1252(e) provide remedies commensurate with the pre-existing habeas corpus remedies, and Congress acted in accordance with the requirements of the Suspension

Clause.  This analysis is in accordance with the Tenth Circuit's suggestion that, to avoid offending the Suspension Clause, a jurisdiction-stripping statute must preserve judicial review for substantial constitutional errors.  *See Fernandez*, 113 F.3d at 1155 & n.3.  Where a petitioner has no procedural constitutional rights in relation to her admission beyond Executive review, she has no colorable claim of constitutional error.

Contrary to Petitioner's argument, *St. Cyr* does not dictate a different outcome.  Although St. Cyr stated that "some judicial intervention in deportation cases is unquestionably required by the Constitution," *see St. Cyr*, 533 U.S. at 300 (quoting *Heikkila*, 345 U.S. at 235), it did not define the scope of review in exclusion cases.  Significantly, *St. Cyr* involved a lawful permanent resident, who after a felony conviction became eligible for deportation.  *See id.* at 293.  The Supreme Court noted that a "construction of the amendments at issue that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions."  *Id.* at 299.  Deportation, however, involves greater procedural protections than exclusion, and thus, *St. Cyr*'s holding does not dictate what the scope of habeas review must be for petitions challenging expedited removal based on mixed questions of law and fact.  Petitioner here challenges the allegedly heightened standard of review that the immigration judge applied.  This claim, however, is not purely a matter of statutory interpretation, but rather requires a court to discuss the evidence in the record supporting or undermining the alien's claim to relief, and thus, requires reversing the manner in which discretion was exercised to exclude the alien.  *St. Cyr* suggests that such determinations do not fall within traditional habeas review.  *See id.* at 306-08 (explaining that courts generally did not review factual determinations by the Executive and that habeas review traditionally subjected to inquiry the legally erroneous failure to exercise discretion, not a substantively unwise exercise of discretion).  *See also Ekiu*, 142 U.S.

at 660 ("[T]he final determination of [] facts may be in trusted by congress to executive officers; . . . no other tribunal, unless expressly authorized by law to do so, is at liberty to re-examine or controvert the sufficiency of the evidence on which he acted."). Although *St. Cyr* states that courts answered questions of law in habeas proceedings brought by aliens challenging Executive interpretations of the immigration laws, it does not hold that the scope of habeas review must include whether the Executive applied the appropriate standard of review or otherwise followed statutory procedures in excluding aliens from the country. *See St. Cyr*, 533 U.S. at 306-08.

Petitioner's reliance on *Boumediene v. Bush*, 553 U.S. 723 (2008), is also unavailing. The *Boumediene* decision involved enemy combatants detained for a significant period of time, perhaps indefinitely, at Guantanamo Bay. *See id.* at 746, 795. In *Boumediene*, the detainees were challenging the legality of their prolonged detention. The Supreme Court outlined the history of the writ prior to the adoption of the Constitution as a means to protect the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account. *Boumediene*, 553 U.S. at 745. The Court described how the writ historically has served as a bulwark against tyranny by providing a judicial forum to protect against the practice of arbitrary imprisonments. *See id.* at 744.

Here, Petitioner is challenging the legality of her expedited removal from the United States, not her detention. Her detention is merely the constitutionally permissible part of that process. *See Demore v. Hyung Joon Kim*, 538 U.S. 510, 523 (2003) (recognizing "detention during deportation proceedings as a constitutionally valid aspect of the deportation process"). In this case, the separation-of-powers principles that inform the reach and purpose of the Suspension Clause must also take into account the plenary powers of the Legislative and Executive branches to protect the borders and control the foreign affairs of the nation. *See*

*Knauff*, 338 U.S. at 542.  Unlike in the indefinite or prolonged detention context, Congress can place the expedited removal decision entirely within the discretion of executive officers, with only the process that Congress sees fit to authorize.  *See Carlson v. Landon*, 342 U.S. 524, 537 (1952).  In *Boumediene*, the Supreme Court noted that the scope of habeas review is adaptable and changes depending on the circumstances.  *See Boumediene*, 553 U.S. at 779.  Because of Congress's sovereign powers to control its borders, an arriving alien who is seeking procedural due process protections to prevent expedited removal is not entitled to the same kind of habeas review and remedies as the indefinitely detained enemy combatants in *Boumediene*.  For aliens that Congress wants to refuse admission into the country, and to detain only for as long as necessary to carry out the exclusion, the liberty interests are far different, and thus, the adequacy of substitute procedures for habeas corpus will likewise be very different.  *See id.* at 781-83 (comparing inquiry into necessary scope of habeas review with test for procedural adequacy in due process context and noting how "intended duration of the detention and the reasons for it bear upon the precise scope of the inquiry").  For arriving aliens, review that they are indeed an alien, subject to a removal order, and have not previously been lawfully admitted, is meaningful review of the cause for their detention pending removal and of the Executive's power to exclude. *Garcia de Rincon* and its progeny are thus not contrary to *Boumediene*.

Petitioner further argues that suspension is occurring here because courts have traditionally examined the legality of the detention under the writ for arriving aliens, particularly whether the executive officer complied with the statutory provisions of the immigration law. The cases relied upon by Petitioner, however, were not framing-era or earlier cases, and thus, give little indication of the common law use of the writ as it existed on or before 1789.  Instead, in the cited cases, the courts reviewed whether the petitioner could be lawfully detained under

the then-existing immigration statutes that only limited review within the Executive Branch of an inspection officer's decision "touching the right of any alien to land, when adverse to such right." *See*, *e.g.*, *Ekiu*, 142 U.S. at 662-63 & n.1.   At that time, Congress had not in the immigration statute expressly removed jurisdiction to consider whether the officer acted in accordance with the statute.   *See id.* at 663-64.   There was thus nothing to show that Congress intended the process due such an arriving alien not to include the power of the courts to review whether the congressionally prescribed process was followed.   That Congress by statute once permitted greater judicial review and procedural rights to arriving aliens does not mean that the Suspension Clause prohibits Congress from providing arriving aliens fewer procedural protections, so long as the writ still lies to determine whether a sufficient ground of removal and detention appears.[5]   *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212-15 (1953) (holding that entering alien detained on Ellis Island, while able to test validity of his exclusion by habeas corpus, did not have right to retry determination of Attorney General in courts, to have a hearing, or to have evidence disclosed to him upon which determination rested).

Here, review lies under the INA to ensure that that the petitioner is an alien, is subject to a removal order, and has not previously been lawfully admitted.   For arriving aliens "who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law," this more limited judicial review is all that is required.   *See Ekiu*, 142 U.S. at 660.

Petitioner argues that, even if the lack of procedural due process rights in relation to

---

[5] *See St. Cyr*, 533 U.S. at 341-42 (Scalia, J., dissenting) ("It could be contended that Congress 'suspends' the writ whenever it eliminates any prior ground for the writ that it adopted. Thus, if Congress should ever (in the view of this Court) have authorized immediate habeas corpus—without the need to exhaust administrative remedies—for a person arrested as an illegal alien, Congress would never be able (in the light of sad experience) to revise that disposition. The Suspension Clause, in other words, would be a one-way ratchet that enshrines in the Constitution every grant of habeas jurisdiction.").

admission for arriving aliens means a restricted scope of habeas review, the restricted scope does not apply to her because she is not an arriving alien within the meaning of Supreme Court precedent.  Petitioner asserts that, although she only travelled nine miles across the border before being apprehended within 30 minutes of crossing the border, and despite the fact that her entry was unlawful, she made sufficient entry into the United States to be entitled to constitutional due process rights.  Petitioner relies on language in a number of Supreme Court and circuit cases that indicate that an alien who crosses the border, even illegally and temporarily, has procedural due process rights.

The Government acknowledges that "some Supreme Court cases suggest the mere fact of physical presence affords illegal entrants some due process rights."  Defs.' Supp. Br. 20, ECF No. 33.  The Government argues, however, that other Supreme Court cases make clear that mere physical entry alone is insufficient to bestow due process rights, rather, an alien must have been lawfully admitted or developed community ties to have due process rights.  The Government argues that aliens like Petitioner who are captured shortly after crossing the border illegally fall in the category of non-admitted aliens who lack procedural due process rights.

As an initial matter, this Court agrees with Petitioner that Congress's recent decision to change the statutory classification of an alien in Petitioner's situation to "inadmissible" under the INA "cannot displace due process analysis or perforce place [her] outside the reach of the Due Process Clause."  *Wilson v. Zeithern*, 265 F.Supp.2d 628, 633 (E.D. Va. 2003).  *See also Boumediene*, 553 U.S. at 765-66 ("[T]he writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers. The test for determining the scope of this provision must not be subject to manipulation by those whose power it is designed to restrain.").  Consequently, to determine which party is correct, the Court must wade further into the tangled

thicket of Supreme Court precedent concerning alien due process rights.

### 3.    Petitioner's Status is Assimilated to that of an Arriving Alien

Certain broad statements of law support Petitioner's position that merely crossing the border entitled her to some constitutional rights, including the right to due process. *See Bayo*, 593 F.3d at 502 ("Once he crossed the border, Bayo became entitled to certain constitutional rights, including the right to due process.") (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Yick Wo*, 118 U.S. at 368). The Supreme Court has explained that the language of the Due Process and Equal Protection Clauses speak to "persons," and thus, the protection of the clauses extends to all persons within the territorial jurisdiction of the United States. *See*, *e.g.*, *Yick Wo*, 118 U.S. at 369.

The cases underlying these broad propositions, however, involved either resident aliens or aliens who had become in some manner part of the population. *See, e.g., Zadvydas*, 533 U.S. at 682   (holding that Constitution limited resident aliens' post-removal-period detention, following orders of deportation based on criminal convictions, to a period reasonably necessary to bring about aliens' removal from United States, and noting that "[a]liens who have not yet gained initial admission to this country would present a very different question"); *Plyler*, 457 U.S. at 210 (holding that undocumented school-age children were entitled to a free public education under the Equal Protection Clause, which broadly refers "to any person within its jurisdiction"); *Diaz*, 426 U.S. at 69-70 (examining rights to Medicare insurance of lawfully admitted resident aliens); *Yick Wo*, 118 U.S. at 374 (applying equal protection rights to Chinese resident aliens). The reach of these statements, thus, does not necessarily extend to the exclusion context. *See*, *e.g.*, *Plyler*, 457 U.S. at 212, n.12 (explaining that the case of *Leng May Ma v. Barber*, 357 U.S. 185 (1958), is not contrary to its holding that the reach of the Fifth Amendment

extends to all persons within territorial boundary of nation, because *Leng Ma* authorized the withholding of deportation for aliens paroled into United States based on "longstanding distinction between exclusion proceedings, involving the determination of admissibility, and deportation proceedings").

For example, in *Shaughnessy v. United States ex rel. Mezei*, the Supreme Court stated: "It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." 345 U.S. at 212. For this proposition, the *Mezei* Court cited The Japanese Immigrant Case *(Kaoru Yamataya v. Fisher)*, 189 U.S. 86 (1903); *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950); and *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 (1953). In those cited cases, as in *Mezei*, the Supreme Court carefully made a distinction between resident aliens and aliens with fleeting connections to this territory. In *Mezei*, the Supreme Court treated the respondent like an entrant alien, despite the fact that he had previously been a resident alien and was currently being detained at Ellis Island, because he left the United States for 19 months: "In such circumstances, we have no difficulty in holding respondent an entrant alien or 'assimilated to (that) status' for constitutional purposes." *Mezei*, 345 U.S. at 214 (quoting *Kwong Hai Chew*, 344 U.S. at 599).

In The Japanese Immigrant Case, the Supreme Court clarified that, in its prior cases upholding limitations of judicial review, the Court never held that administrative officers may disregard the fundamental principles that inhere in due process of law or that they have the absolute, arbitrary power to deny an alien applicant for admission the opportunity to be heard before such officers upon questions involving his right to be and remain in the United States. *See Kaoru Yamataya*, 189 U.S. at 100-01. The Supreme Court, however, was careful to

"[l]eav[e] on one side the question whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed. . . ." *Id.*  The Supreme Court further stated:

> Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause *an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population*, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States.

*Id.* at 101 (emphasis added).

The holding of *Wong Yang Sung* likewise did not elucidate the rights of aliens who briefly and clandestinely entered the country:  "It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing *at least for aliens who had not entered clandestinely and who had been here some time even if illegally*. *Wong Yang Sung*, 339 U.S. at 49-50 (emphasis added).  Similarly, *Kwong Hai Chew* dealt with the right of a resident alien, holding that a resident alien has due process rights, even though he left on an American ship for four months.  *See Kwong Hai Chew*, 344 U.S. at 600.  The Court noted its reliance on resident alien cases and cited case law discussing the "ascending scale of rights as [the alien] increases his identity with our society."  *See Kwong Hai Chew*, 344 U.S. at 596 n.5.  The Court also cited *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (concurring opinion), for the proposition that, "The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters *and resides in this country* he becomes invested with the rights guaranteed by the Constitution to all people within our borders."  *Kwong Hai Chew*, 344 U.S. at 596 n.5 (emphasis added).  The Supreme Court in *Kwong Hai Chew* construed the then-existing immigration statute that allowed the Attorney

28

General to deny a hearing when issuing an order of permanent exclusion as raising no constitutional conflict because it limited the reach of the statute to "entrant aliens and to those assimilated to their status." *Id.* at 591-92, 598-99.

In *Landon v. Plasencia*, the Supreme Court confirmed that aliens seeking initial admission to the United States request a privilege and have no constitutional rights regarding their application. 459 U.S. at 32. The Supreme Court noted, however, that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Id.* The Supreme Court extended its rule that a continuously present permanent resident alien has a due process right to a fair hearing when threatened with deportation to resident aliens who are seeking re-admission to the country after an absence of only a few days. *See id.* at 32-34.

Petitioner argues that the *Plasencia* case should not be read to impose any limitation on due process rights of aliens crossing the border because the Supreme Court used the community ties of the alien in that case to enlarge her due process rights, not shrink them. The Supreme Court in *Plasencia*, however, discussed the importance of residency and other community ties because prior Supreme Court cases like The Japanese Immigrant Case had already made those limiting distinctions. Indeed, in dicta, the Supreme Court has affirmed the limited reach of this line of cases when it noted that the cases on which it had held aliens enjoy certain constitutional rights, including *Plyler*, *Kwong Hai Chew*, *Wong Wing*, and *Yick Wo*, "establish only that aliens receive constitutional protections when they have come within the territory of the United States *and* developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270-71 (1990) (emphasis added). *See also American Immigration Lawyers Ass'n*, 18 F.Supp.2d at 59-60 (noting line of cases that grant constitutional protections applies to

permanent residents or those with "substantial connections" to United States).

Petitioner, who undisputedly crossed approximately nine miles over the border and was apprehended within 30 minutes of crossing, does not have any substantial ties to this country to place the nature of her rights near those of a permanent resident.  Thus, for purposes of the constitutional right to due process, Petitioner's status is assimilated to that of an arriving alien. *Cf. Mezei*, 345 U.S. at 214 (holding that respondent, an alien whose prior residency was interrupted by 19-month absence, was assimilated to entrant alien status for constitutional purposes); *Sierra v. Immigration & Naturalization Service*, 258 F.3d 1213, 1218 (10th Cir. 2001) (stating that parolee alien, who had been physically present in United States for more than 20 years but considered legally detained at border as never having effected entry into country, did not have liberty interest in being released on parole for purposes of procedural due process claim because, as an alien denied entry, he was only due the procedure authorized by Congress).  *See also Diaz Rodriguez v. U.S. Customs and Border Protection*, No. Civ. 14-2716, at 7, 2014 WL 4675182 (W.D. La. Sept. 18, 2014) ("The expedited removal statute applies with equal force to illegal entrants within 100 miles of the border who cannot show that they have been physically present in the United States continuously for the fourteen-day period immediately preceding the date of their apprehension. 8 U.S.C. § 1225(b)(1)(A)(iii). In such a situation, the entrants have not developed the ties or property interests that a lawful permanent resident or even an illegal entrant residing more than two weeks may have developed. . . . Diaz Rodriguez has not shown that he has been lawfully admitted, so the due process rights of a lawfully admitted citizen are not implicated here.").

Accordingly, Petitioner has no constitutional due process rights in relation to her admission beyond that authorized by Congress.  The restricted habeas review provisions set forth

in Section 1252 adequately protect Petitioner's rights because she has a meaningful review of the cause for her exclusion and of the Executive's power to exclude her. The writ therefore has not been suspended and the Court lacks jurisdiction to review Petitioner's claims. *See Garcia de Rincon*, 539 F.3d at 1140-41; *Lorenzo*, 508 F.3d at 1281 (holding that strict limitations set forth in Section 1252(e) preclude judicial review of "any constitutional or statutory claims related to the underlying" expedited removal order); *Vaupel*, 244 F. App'x at 895 (holding that under § 1252(a)(2)(A) court lacked jurisdiction to consider due process claim in habeas petition of resident alien, who was subject to expedited removal after he failed to depart the United States following expiration of his period of parole); *Shunaula*, 732 F.3d at 145-47 (holding that § 1252(a)(2)(A) barred review of petitioner's claims, including as-applied due process challenges to expedited removal order).

### B.     Request for Emergency Stay

As this Court lacks jurisdiction over the merits of Petitioner's claims, Petitioner cannot succeed on the merits. Petitioner's request for an emergency stay of removal must therefore be denied.

## V.     CONCLUSION

The federal courts have often been pressed upon by desperate immigrants seeking a judicial remedy to avoid a return to their homeland. *See, e.g., Haitian Centers Council*, 509 U.S. at 188. The sheer numbers of such cases have often resulted in policies by the Executive Branch aimed to stem the immigrant flow and turn away the masses in light of the economic, political, and social concerns of the nation. The case at hand presents a tragic situation of an immigrant reaching these lands in an attempt to escape the dangerous, potentially life-threatening conditions in El Salvador. Petitioner has sought the protections of our nation's asylum laws, but Congress,

within its sovereign and constitutionally granted powers, chose to place the asylum determinations in the hands of experienced professionals within the Executive Branch to ensure an expedited process that would not overwhelm the resources of that branch.  Petitioner, detained near the border within 30 minutes of illegal entry, does not have sufficient ties to this country to change her status from that of an arriving alien, and thus, this Court cannot thwart Congressional intent and find jurisdiction under the Suspension Clause to second-guess in habeas the administrative decisions of the executive officers to exclude her.  The substitute habeas procedures are sufficient to ensure the legality of Petitioner's exclusion, and thus the restrictions on habeas review do not offend Petitioner's rights under the Suspension Clause.  As the Supreme Court has found itself compelled to note in such cases, "Although the human crisis is compelling, there is no solution to be found in a judicial remedy."  *Id.* (quoting *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 841 (D.C. Cir. 1987)).

**IT IS THEREFORE ORDERED** that Petitioner's Emergency Motion for Stay of Removal (**ECF No. 2**) is **DENIED**.

_____

**UNITED STATES DISTRICT JUDGE**